AARON E. JOHNSTON

*v.*

PATRICK J. REILLY, PATRICK SKELLY et al.

[Argued November 16th, 1904.  Decided February 2d, 1905.]

1. A judgment creditor sold under execution a valuable equity of redemption in mortgaged premises, and became the purchaser for the amount of his judgment.  Subsequently he sold the equity to defendants for a small sum on their fraudulent representations that they were acting for the debtor, and title was conveyed to their co-defendant.  On foreclosure of the mortgage the premises were purchased by the co-defendant

at a fair valuation, which exceeded all liens by several thousand dollars. Subsequently the defendants fraudulently procured an order authorizing the sheriff to accept the co-defendant's receipt for the surplus, and the money was divided between defendants.—*Held,* on a bill by the mortgagor, that the co-defendant was liable, though he may not have actively participated in the fraud.

2. The co-defendant was liable for the amount of his bid, and was not entitled to any allowance for services or counsel fees.

3. Where a mortgagor defrauded of the surplus on foreclosure agreed to pay her attorney a sum not to exceed twenty-five per cent. of any amount that he could recover, and on her death he continued the action for recovery as her representative, such agreement could not affect the equity of his cause, as the orphans court had power to limit his compensation if injustice should appear.

4. Where surplus moneys from a mortgage foreclosure were involved, and the purchaser sought to be excused from paying the money into court, it was contrary to good practice to permit the sheriff to accept his receipt for the money without summoning all the parties to the suit.

---

On final hearing on bill, answer and proofs.

The bill in this cause was filed by Mary E. Throckmorton, who, having died pending suit, her executor, Aaron E. Johnston, was substituted as complainant and the suit proceeded in his name. The cause first came before the court for judicial consideration upon a demurrer to the bill. The demurrer was overruled, as reported in *Throckmorton* v. *O'Reilly, 55 Atl. Rep. 56.* The order overruling the demurrer was carried to the court of errors and appeals, and there affirmed, as reported in *Johnston* v. *Reilly, 66 N. J. Eq. (21 Dick.) 451,* and was remanded to this court for further proceedings.

Hugh O'Reilly died, pending the suit, and his executrix was made a party but was not brought in, being a non-resident.

An answer was filed by Patrick Skelly, individually and as executor of his deceased partner Fogerty, there having been a firm of O'Reilly, Skelly & Fogerty, who were the mortgagees of the mortgages set out in the bill of complaint herein and the complainants in the bill to foreclose the same.

By his answer Skelly denied all knowledge of or participation, directly or indirectly, in the matters charged in the bill, upon which the complainant claims that O'Reilly, Skelly & Fogerty

are liable to account to her for certain moneys, and he asserted that their only connection with the affair was to employ a solicitor to foreclose their mortgages and realize the money thereon.

This contention was sustained at the hearing and the bill was dismissed as to Skelly, with costs to be paid out of complainant's estate.

The defendant Patrick J. Reilly (whose name must not be confused with that of O'Reilly) answered separately, and denied each and every of the allegations of the bill upon which the complainant relied to charge him as a trustee for Mrs. Throckmorton.

*Mr. Frank P. McDermott,* for the complainant.

*Mr. Charles J. Roe,* for the defendant.

At the close of the evidence and argument thereon, November 6th, 1904, the vice-chancellor at once disposed of the main question in the cause, giving his reasons therefore, substantially as follows:

PITNEY, V. C.

The bill was filed by Mrs. Throckmorton to recover the amount of the surplus moneys arising from the sale at foreclosure of certain real estate situate at Long Branch, in this state, and known as the Rockwood Hotel.

The bill alleges that the property was worth nearly or quite $20,000; that the mortgage and tax encumbrances amounted to a trifle less than $8,000, and that it was brought to sale on the 5th of August, 1901, under an execution out of this court to raise that sum.

That several months previous to that the premises had been sold at sheriff's sale, subject to the mortgage and tax liens, under common law judgments against Mrs. Throckmorton, who was then the owner of the equity of redemption, and purchased by one Clarence G. Van Note for the sum of $734.28, which

was the total of the judgments; that Van Note was friendly to complainant and willing to reconvey the premises upon being made whole for the amount he had expended and a reasonable sum for his trouble and services; that for some time before August 5th, 1901, on which day the premises were sold under foreclosure, she was engaged in attempting to raise the money to redeem the premises from Van Note and to pay off the mortgages under foreclosure; that Mr. Duffy, the solicitor of the complainants in foreclosure, and Hugh E. O'Reilly, Jr. (a grandson of Hugh O'Reilly), the complainant, and Thomas P. McKenna, a counselor-at-law of this state, visited the complainant a few days prior to the 5th of August, 1901, and attempted to purchase from her the equity of redemption which she had in the premises.

They represented to her that they came from Hugh O'Reilly, one of the mortgagees, and that she declined to deal with them, and distinctly informed them that she claimed to be owner of the premises and expected to be able to pay all the encumbrances before the sale.

The bill further charges that the said Duffy, McKenna and O'Reilly, Jr., then applied to Van Note to purchase his title, and

"represented to him that they were acting as representatives of the complainants in said suit, but for the benefit of and in the interest of your oratrix, and requested him to make a deed for his interest in said premises to such person as they should name, and offered to pay him for making such deed the sum of twelve hundred dollars or thereabouts, which he had agreed to take from your oratrix in settlement of his claims, and they further represented to him that said deed would be for the benefit of your oratrix, and would protect her and secure her interest in said premises, at and after said foreclosure sale, and would secure her any surplus arising from such sale."

This is the allegation in the bill which was seriously contested by the defendant, and which was the basis of the declaration by the court of errors and appeals that the representations so made would establish against the defendants, in favor of "Mrs. Throckmorton, a constructive trust arising *ex-maleficio,* co-extensive with the representations so made, without regard to

the question whether there was, at the time, any enforceable arrangement between herself and Van Note."

The bill further alleges that, relying upon these representations, Van Note made a conveyance of the premises to Patrick J. Reilly, on August 3d, 1901, for about $1,200, and that on August 5th Patrick J. Reilly purchased the premises at sheriff's sale for $16,300; that on August 14th Reilly applied to the court, by petition, setting up his conveyance from Van Note, and procured an order upon the sheriff to accept the receipt or order of the defendant Reilly for the amount of the surplus money, and that in pursuance of that order the sheriff made and delivered a deed to Reilly without the payment of any money except that required to satisfy the liens provided for in the decree of foreclosure. The bill further alleges that this order was procured without notice to complainant, although she was a party defendant and had appeared to the suit by a solicitor.

The bill shows that after allowing the defendants for all that was paid to satisfy the liens, and also to repay the amount paid to Van Note, there remains of the surplus money nearly $8,000, for which the defendants should account to her. The bill then charges that the sum of $8,000 "is due to the complainant from the said Patrick J. Reilly, or from the other defendants, or from some one of them, and that they or some one of them should be decreed to pay the same to her, with interest," &c.

All the defendants except Patrick J. Reilly having been discharged from liability, there remains to consider only the case as against him.

There is little dispute as to the main facts of the case.

The evidence makes it quite clear that Mr. Van Note was willing to reconvey the property to Mrs. Throckmorton upon being repaid the amount which he paid for the premises, together with interest and something for his trouble, and the costs of the litigation which he had to get possession of the premises for his tenant.

It is equally clear that pending foreclosure proceedings Mrs. Throckmorton employed Mr. Northrop, of Jersey City, to procure a loan for her, and that he did attempt to do so, and that

Mr. Van Note corresponded with Mr. Northrop on the subject, and was willing to make the title to Mrs. Throckmorton upon being paid a round sum of money.

These efforts of Mr. Northrop failed, and the property was advertised for sale. Mrs. Throckmorton was a disagreeable person with whom to transact business; she was very poor; she had received nothing from the rents of the premises for several months, if not years, they having been absorbed in paying off certain judgments and tax liens paramount and over and above that under which Mr. Van Note acquired title; she was suffering from tuberculosis, and, with all, was indulging somewhat freely in intoxicants. Altogether Mr. Van Note became disgusted and decided in his mind to retain the title and the benefits of the surplus for his own use. He knew the value of the property and that it could be sold to advantage; that the present tenant, Mr. Vaugoin, was a prospective purchaser, and that another gentleman, a Mr. Nathanson, was able and willing to purchase (this gentleman, Mr. Nathanson, bid the property up at the sale against Mr. Reilly).

This was the attitude of Mr. Van Note up to a few days before the sale.

It is worth while, here, to say that the mortgagees, who were complainants in the foreclosure proceedings, were the survivors of a firm of brewers, and had owned the premises and conveyed them to complainant in 1882, and had taken one of their mortgages as a part of the consideration for that conveyance, and that ten years later (1892) the complainant and her husband gave a second mortgage to the same gentlemen, which was retained until both were foreclosed, as previously stated.

Mr. Hugh O'Reilly, Sr., had a summer home at Long Branch and was very friendly with the complainant, and she had good reason to believe he was not disposed to do her an injury pecuniarily. He was living in Long Branch in the summer of 1901, but was aged and feeble in health.

A few days before August 5th, 1901, the day of the sheriff's sale here in question, Hugh E. O'Reilly, the grandson of the mortgagee of that name, who lived with him, and who is a

real estate broker in New York City, and a Mr. Thomas P. McKenna, a lawyer then practicing in Long Branch, who was intimate with young O'Reilly (of whose sister he was a suitor and subsequently became her husband), called on Mrs. Throckmorton twice in about a week, at her boarding-house in Long Branch, and tried to purchase from her her interest in the premises. They stated that they came from Hugh O'Reilly, Sr., and were acting on his behalf.

They knew that the title was held by Van Note. They offered her a small sum of money and a house in the neighborhood, which they said were to be paid and given by the elder O'Reilly, and which offer she indignantly declined, declaring that she was the owner of the premises and expected to raise the money to pay off all encumbrances before the property was brought to a sale. These interviews and their purport is proven by Mrs. Throckmorton, who was examined *de bene esse pendente lite,* and by Mr. and Mrs. Child, with whom she boarded, and are not seriously disputed, except as to their purport, by Hugh O'Reilly and McKenna. Their date is fixed by the circumstance that Mrs. Throckmorton only stopped with Mr. and Mrs. Child about three weeks, and that she was stopping there at the time of the sale. I am sorry to say that Mr. McKenna tried to avoid the effect of this interview by fixing its date several months previously.

Mr. Hugh O'Reilly, in his evidence, admits an interview which took place at about the date alleged by the complainant, but both he and McKenna deny that they made any such offers to purchase as is testified to by the other witnesses. I am unable to give credence to this denial because I believe Mr. and Mrs. Child, who seem plain, unsophisticated and certainly disinterested witnesses; and, further, because neither McKenna nor O'Reilly was able to give any other satisfactory reason why they made the visit or visits.

About the time of those interviews—but whether before or after does not appear—O'Reilly and McKenna, or one of them, called on Van Note and tried to buy his interest at a small price, and he positively declined to sell it to them; but, nevertheless, they asked him to think it over.

This he did, and, knowing Mrs. Throckmorton's destitute condition, he concluded, in his own mind, that he would reconvey it at a comparatively small price if she should have the benefit of the profit, and at a second call from those gentlemen he agreed to convey it to one of them, provided that Mrs. Throckmorton was to have the benefit of all it brought over and above the encumbrances and the amount they paid him, and approve the conveyance in writing and release him.

He swears that they represented to him that they came in her interest. There was more than one interview, about that time, between the parties, and at one or two of those Mrs. Throckmorton was present.

I will quote a portion of Mr. Van Note's evidence. After stating the long series of attempts that were made on behalf of Mrs. Throckmorton by different persons, including Mr. Northrop, to raise money, and his willingness to give Mrs. Throckmorton the benefit of her equity of redemption, he continues:

"So finally I became rather disgusted with having so much bother with first one and then another, and I told Mrs. Throckmorton that unless she carried out this plan with Mr. Northrop I wouldn't bother any further with it or with her in the matter; that fell through; the property was advertised under foreclosure; just a few days—my impression is within a week of the date of sale—I was going along Broadway [Long Branch], and Mr. Thomas P. McKenna, a lawyer in Long Branch at that time, called me up in his office, and he had Mrs. Throckmorton there; Mr. McKenna said to me that he now represented Mrs. Throckmorton and as well represented the O'Reilly family; * * * Mr. McKenna said that Mrs. Throckmorton had been down and had seen Mr. O'Reilly, Sr.; [and McKenna further stated that] while they had begun this foreclosure, the foreclosure was more to settle up the old concern of O'Reilly, Skelly and Fogarty than anything else; and they did not wish to be the means of putting Mrs. Throckmorton out of her property or anything of that kind; and that they had now entered into an arrangement whereby if they could get a clear title to the property without going up too high they would take it, and either make a deed for it to Mrs. Throckmorton and take a mortgage back for the full amount that was necessary to straighten it out or else take a deed for the property in some one's name and hold it for her benefit; if they took the latter course they would collect the rent that came in, make her a small allowance on which she could live, credit the rest on the mortgage and then make a deed back to her; or if they deemed it advisable, with her consent, at any time they got a good price, to sell the property and take out the amount they had advanced and give the surplus to her; I told Mr. McKenna and Mrs.

Throckmorton at that time I would have nothing more to do with it—no more negotiation; Mr. McKenna asked me to think it over and told me that I was the only one that stood in the way of letting her get on her feet, and so forth and so on, and I made an appointment to meet him a few days later; I thought the matter over and I did meet him a few days later; . * * * both Mrs. Throckmorton and Mr. McKenna; and I told them that upon their payment to me of $1,200 or $1,250 I would make to Mrs. Throckmorton a deed for whatever interest I had, she to give me an agreement releasing me from any claims, or I would make a deed to anyone she might designate; Mr. McKenna said that he thought the amount of money was a little bit high because I had some money out of the rents, and so forth, but said that he would see the O'Reillys; a day or two later he telephoned me and asked me to come down to the office; I went down to his office and there was Mr. McKenna and young Mr. O'Reilly—that is, Hugh O'Reilly, Jr., I think his name is; they told me then that they had consented to carry out this plan and that Mr. O'Reilly would give me a check for $1,250—that is, they tried to get it down a bit; the outcome of that conversation was that Hugh O'Reilly, Jr., was to give me his check for $1,250.

"So they told me to prepare the deed and asked me if J would take Hugh O'Reilly's check—young Hugh's—and I said yes; but I told them that I wouldn't give them a deed until I had a statement in writing from Mrs. Throckmorton, either releasing me or designating the person to whom I should make that deed; they wanted to clean the matter right up, so there need not be any further adjournment of the sale; their idea at that time was to go on with the sale anyway; then, after they got it straightened up, on a Saturday afternoon—that would be August 3d, if I remember it rightly—young Mr. O'Reilly—that is, Hugh O'Reilly, Jr.—and Mr. Thomas P. McKenna came up to my house—my office was closed—and asked me for the deed; I had the deed prepared and I think one of those gentlemen took my wife's acknowledgment, although I am not certain as to that; but, anyway, it was at my house; they gave me a check; you haven't the deed I am talking about now; Mr. O'Reilly produced his check for either $1,200 or $1,250 and asked me for the deed; I told him that was not the arrangement, and I would not give him the deed until I had this written agreement from Mrs. Throckmorton; they told me that they had been trying all the afternoon to get Mrs. Throckmorton, and as it was Saturday, and they wanted to sell on Monday, they did not want to delay further, but they said if I would give them the deed they would promise me that they would not use the deed or would not go on with the sale until they gave me such an agreement; they left the house with that understanding, leaving me the check; I gave them the deed; they told me they would not use the deed; so, along early in the evening, then, Mr. McKenna and Mr. Hugh O'Reilly, Jr., came back to my house, and they told me that they had been unable to see Mrs. Throckmorton, but that this was the arrangement absolutely understood all around, and asked me to deviate from that part of my agreement and let them take this deed, and let them sell the property on Monday, and that any agreement I wanted to get from her afterwards, why they would get for me; so I said all right; I didn't want to stand in the way if the thing was going to be cleaned up; so they left in that way."

That check, drawn by Hugh E. O'Reilly, on the Garfield National Bank (New York), dated August 3d, 1901, in favor of Clarence G. Van Note, for the sum of $1,250, was deposited by Mr. Van Note to his account in the Long Branch Banking Company on Monday morning, August 5th, as appears by an entry in his bank pass-book. On Monday morning, after this deposit, as I interpret the evidence, and as Van Note testified on being recalled at the close of the case, Hugh E. O'Reilly and McKenna called on Van Note and asked him to receive back the deed already delivered and make another in its place to Patrick J. Reilly, the defendant herein. It is worth while to say here that O'Reilly and McKenna swear that this occurred on Saturday, the 3d, but it makes no difference in the result; they admit that the deed to Hugh E. O'Reilly was executed and delivered.

Van Note swears distinctly that this application for a change was accompanied with a representation that Reilly was a relative of Hugh, and that the deed was to be made upon the same conditions as the previous one, namely, for the benefit of Mrs. Throckmorton, and that the change was in fact made upon that understanding.

The second deed—that to the defendant Reilly—was prepared by McKenna, except the description, and duly executed. Its acknowledgment was also filled out and taken by Mr. McKenna, and the deed and acknowledgment are both dated August 3d, but the date in the certificate of acknowledgment is not conclusive, in my mind, of the actual date of the transaction.

The check of Hugh E. O'Reilly passed through the regular course of business and was protested on the 6th day of August, its payment having been stopped.

In its place, a check of Patrick J. Reilly, on a New York bank, for $1,250, to the order of Van Note, was handed to him, on Tuesday, the 6th, by Hugh E. O'Reilly.

Mr. Van Note came upon the stand and testified, at first, without having examined his bank account, without having before him either of the checks used in this transaction, and

apparently without having in any way refreshed his memory as to the precise details of the transaction about which he was to testify.

Relying upon the date and certificate of acknowledgment of the deed from himself and wife to Reilly, which was the only deed in existence, the deed to Hugh E. O'Reilly having been destroyed, he tried to compress both transactions into one day and to reconcile his memory with the apparent date of the deed to Reilly, and in so doing fell into some inaccuracies of detail.

After he had left the stand, which was on the first day of the hearing, and before the last day of it, he examined his bank pass-book and secured from the cashier a statement, which was by consent received in evidence, showing the history of Hugh E. O'Reilly's check, and of the second check (of P. J. Reilly), of the same date, that later on was given in its place. Now, if at the time that arrangement for a change of deeds was made and the deed to Reilly substituted for that to O'Reilly, the latter's check had not been deposited in bank, I can see no reason why Van Note should afterwards deposit it.

The check, lying in his pocket or safe, was just as perfect security for the ultimate payment of the Reilly check without being protested as it would be if protested. The expense and trouble of presentation and protest were a mere waste and served no useful purpose.

I conclude, therefore, that the probability is that the second deed was prepared and was executed on Monday morning, after the deposit of the first check, and that the deed and acknowledgment thereof taken by Mr. McKenna was dated back to Saturday, the 3d, and, as before remarked, Van Note so swore on his second examination.

His impression was—and he so swore, at first—that Mr. Duffy called on him to make the change in the grantees of the deeds, and that it was with him that the conversation was had to the effect that the new deed was taken on the same condition that the first one was made and accepted. In this he was mistaken and was convinced of his error by conversation with Mr. Duffy. The arrangement for the second deed was made with

Hugh E. O'Reilly and McKenna, or one of them, and the second check, namely, that of Reilly, came to Van Note from O'Reilly, on August 6th.

I notice this confusion in details of Mr. Van Note and his mistake as to Mr. Duffy's connection with the affair because they were made the basis of a severe attack on his reliability as a witness. I naturally paid close attention to Mr. Van Note, both in respect of his manner on the stand and the details of his evidence, and came to the conclusion that he was reliable and stated the truth as he believed it to exist.

In the first place, he is entirely disinterested in the result of the action. I am unable to perceive what interest he has in the success of the complainant.

In the next place, it is a part of the defendant's case that Van Note was under no legal or equitable obligation to Mrs. Throckmorton in the premises, and they admit that on their first interview with him he absolutely declined to convey to McKenna or O'Reilly.

I think it probable that he was justified in his feeling that he was not obliged, in equity, farther to recognize Mrs. Throckmorton's interest in the premises, for the reason that having originally purchased the premises under circumstances that gave her no right to redeem except on the ground of the inadequacy of consideration, he had destroyed any such ground by giving her an option for many months to redeem on reasonable terms, which she had failed to do. He was then, as he believed, master of the situation, and, as I have already remarked, he knew the value of the property.

Now, I am unable to perceive that there was any motive which could operate on his mind to induce him to convey to a perfect stranger, in whom he had no interest whatever, an equity of redemption easily worth $6,000 or $8,000, for the paltry sum of $1,250. I am unable to imagine any motive for a conveyance for that small consideration except a feeling that it would be, after all, but just and right to make the conveyance to and for the benefit of Mrs. Throckmorton.

Another circumstance may have some bearing in this con-

nection. Mr. Van Note was informed, shortly before the sale, by Mr. Thomas P. Fay, of the Long Branch bar, that he (Fay) was preparing to commence a suit against him (Van Note), for Mrs. Throckmorton, to set aside the sheriff's sale to him (Van Note) on the ground of some fraud or collusion. And while Van Note apparently felt no fear of success by Mrs. Throckmorton in such a suit, the situation seems to me not to increase, but rather diminish, the probability of his selling the property to a stranger at one-fourth its value, with the threat of such a suit hanging over him.

Now, McKenna and O'Reilly deny, positively, all of Van Note's statements as to the conveyance being made for the benefit of Mrs. Throckmorton. They deny that they had any idea that Mrs. Throckmorton seriously expected to derive any benefit from the sale, and supposed that Van Note was the absolute owner.

It thus appears that the difference between Mr. Van Note's evidence and that of Messrs. McKenna and O'Reilly is radical and irreconcilable. It is not a case where it is admitted that a conversation on a certain subject and along certain lines did take place and the different witnesses disagree in their understanding and recollection of the purport of the conversation.

And here intervenes the importance of the previous interviews McKenna and O'Reilly had with Mrs. Throckmorton, and their effort to purchase her interest. Besides, Mr. Fay swears that he informed Mr. McKenna, some time before the sale, that Mrs. Throckmorton claimed an interest in the premises, and that he was about filing a bill in this court to establish it.

If the case stopped there, I should believe the evidence of Mr. Van Note. I am unable to believe that he deliberately perjured himself. Be that as it may, when we come to consider the conduct of the parties McKenna, Hugh E. O'Reilly and Patrick J. Reilly, I think there can be no doubt about it.

The case presents no particle of reason for the change of the deed from one to Hugh E. O'Reilly to one to Patrick J. Reilly, and the corresponding change of checks, except a desire

to have the title placed in a person as near as possible in the position of a *bona fide* purchaser without knowledge.

I will deal with that question hereafter.

I come, now, to the history of the affair after the execution and delivery of the (second) deed to Patrick J. Reilly.

This business of procuring the execution of the deed to the defendant Reilly having been concluded, Hugh E. O'Reilly, McKenna and Van Note, on Monday, August 5th, proceeded to Freehold and attended the sheriff's sale, and there met Mr. Duffy, the solicitor of the complainant, who lived at Jersey City.

Mr. Hugh E. O'Reilly swears that the arrangement that P. J. Reilly should buy the premises, and that he, Hugh E. O'Reilly, should manage the affair for him, was made between the two some two or three weeks before the sale (which, as I interpret the evidence, would be prior to the time that he and McKenna called on Mrs. Throckmorton at the house of Mrs. Child), and that, without seeing Mr. Reilly from the time the bargain was made and completed with Van Note until the property was set up for sale, he instructed Duffy to bid for Reilly.

Mr. Duffy swears that he was authorized by Mr. Reilly, the defendant, by his agent, Hugh E. O'Reilly, to purchase the premises.

They were put up for sale and were bid up by Mr. Nathanson, against Mr. Duffy, bidding for Reilly. The precise amount of each advance was not stated, but toward the last it was not over $100, and the premises were finally struck off to Mr. Reilly at $16,300. Duffy swears that he subsequently offered them to Mr. Nathanson at the amount of Nathanson's last bid, and that Nathanson declined to take them at that bid or to make any offer. He was not called as a witness by either party, but it abundantly appeared that he wished to purchase the premises on his own account, and was able to make good his bid, which was made in good faith.

The deed from Van Note to Reilly was lodged for record the 6th of August. Shortly before, or just after, the sale, Hugh E. O'Reilly placed $2,000 to the credit of the defendant P. J.

Reilly in the Garfield National Bank of New York, and that gentleman drew his check, dated the 3d of August, to the order of Van Note, for $1,250, and Hugh E. O'Reilly handed it, August 6th, to Van Note, who deposited it to his account in the Long Branch bank on the 7th of August, the second day after the sale, and was duly charged by that bank with the Hugh E. O'Reilly check returned protested.

Mr. Fay was at and before this time acting for Mrs. Throckmorton, and had already prepared, in whole or in part, a bill setting out the circumstances preceding and attending the sheriff's sale to Van Note with a considerable of detail, and charging him with inequitable conduct and praying relief against him (Van Note). This bill had not yet been filed. Fay attended the sale, on August 5th, and did the bidding for Mr. Nathanson, in his actual presence, and heard the property knocked off to Reilly, but did not know of the conveyance from Van Note to Reilly, which was not recorded until the next day, August 6th. Fay, whose office was at Long Branch, proceeded at once to complete his bill and to fasten Mrs. Throckmorton's alleged right on the surplus money. With this view he, on August 9th, procured a lengthy affidavit from Mrs. Throckmorton, and with this annexed to his bill procured from Vice-Chancellor Reed, on August 12th, an order restraining both Van Note and the sheriff, the one from receiving and the other from paying to Van Note, or to any other person, the surplus money arising from the sale, and the sheriff was ordered to pay the same into the court.

It is quite plain, from an examination of this bill, that when filed Van Note was the only defendant named in it, and it was aimed wholly at him.

It was subsequently amended by the insertion of two pages, namely, pages 20*a* and 20*b,* setting out the conveyance from Van Note to Reilly, and further stating as follows:

"And your orator further shows that the said Clarence G. Van Note has, *since the preparation of this bill and since the signing of the order in this cause,* claimed to your oratrix that he made the said deed to Patrick J. Reilly for the benefit of your oratrix, and that Thomas P. McKenna, a counsellor-at-law, of Long Branch, New Jersey, and Hugh O'Reilly,

a counsellor-at-law of the State of New York, and Joseph A. Duffy, an attorney-at-law of the State of New Jersey, claimed at the time that they secured the conveyance from the said Clarence G. Van Note that they were representing your oratrix, and that the deed that was made by the said Clarence G. Van Note was made for the benefit of your oratrix."

Then follows a charge that *Patrick J. Reilly took the title for McKenna, Hugh O'Reilly and Duffy, and· that the last-named persons intend to divide between themselves the profits of the resale of the premises.* A truly prophetic charge!

But the prayer of the bill was not at all changed, and was still aimed entirely at Van Note. The names of Reilly, McKenna, Hugh O'Reilly and Duffy were inserted in the prayer for process.

With the restraint of Vice-Chancellor Reed in their way, and with a view, as I believe, of avoiding it, Reilly, by his solicitor, Mr. McKenna, on August 14th, 1901, filed a·petition, in that foreclosure suit, setting up that he was a purchaser at the sale, and that he was the owner of the equity of redemption by setting out Van Note's title and the conveyance from Mr. Van Note, and that he was thereby entitled to the surplus money, and prayed that the sheriff might be directed to deliver the deed to him upon payment of the amount of the encumbrances and accrued costs and a receipt to the sheriff by him of the surplus money. That petition was immediately referred to a special master, who, not suspecting any fraud, immediately made a report according to the prayer of the petition, upon the evidence, among other things, of the defendant Reilly, who appeared in person before him, and without summoning any of the defendants to appear. Upon that report an order was made by this court, on August 20th, 1901, directing the sheriff to accept the receipt or order of Reilly as payment to the extent of the balance of the purchase-money over and above the amount directed to be raised by execution.

This order made Mr. Reilly the master of the situation, having, apparently, the aid of Mr. Duffy, who must have acted mainly through the instructions of Mr. Hugh E. O'Reilly, who, it abundantly appears, assumed to act for the complainant in foreclosure. Mr. Duffy obtained the deed from the sheriff to

Reilly by receipting the sheriff's docket all around and paying his fees and paying the tax liens. He then raised a loan of $8,000 upon the premises by bond and mortgage and paid the complainants O'Reilly, Skelly and others the amount due them and allowed Mr. Vaugoin to remain in possession as tenant.

Several months later (May, 1902) he conveyed the premises to Vaugoin for $14,500.

Mr. Duffy swears that he himself received the amount of the purchase price over the mortgage, viz., $6,500; that he disposed of it as follows: He retained thereout $500 for his own services, and by Mr. Reilly's express direction to him, in person, he handed $3,000 of it to Mr. McKenna and $3,000 to Mr. Hugh O'Reilly. He accompanies the statement of the payment to Mr. McKenna with the statement that he understood that it had something to do with some kind of a stock transaction between Mr. McKenna and Mr. Reilly. Mr. McKenna does not enlighten us on the subject of the final destination of that $3,000, but contents himself by saying that $1,200 of it was for his services in the matter. Mr. Hugh E. O'Reilly swears that he disposed of the $3,000 paid to him by Duffy as follows: He kept $2,000 of it to repay him the $2,000 he had advanced to Reilly before the sheriff's sale; that he kept $500 for his own services for negotiating the purchase from Van Note, and that he graciously handed back to Mr. Reilly the sum of $500. It appears that Mr. Reilly paid $1,250 in cash to Van Note, $424.99 to Mr. Green, who had a decree for a tax lien, and whether he or Mr. Duffy paid the sheriff his execution fees does not appear; but it abundantly appears that the faithful assiduity of his friend and agent, Hugh O'Reilly, and the faithful services of Mr. McKenna and of Mr. Duffy, have left Mr. Reilly but a small portion in fact of the profits which arose from this transaction. And the charge of Mr. Fay's bill, in that respect, appears to have been well conceived.

The complainant in this bill charges that the order of August 20th, 1901, by which the sheriff was directed to take Reilly's receipt for the surplus money, was procured by fraud upon the practice of the court and was contrary to the well-settled prac-

tice of the court. In this I think she is clearly right. In the first place, by the clear, well-settled practice of the court, it is the duty of the master, to whom such an order of reference is made, to summon all the parties to the suit to appear before him at the hearing. I may add this is the only safe practice where surplus moneys are involved.

The practice in foreclosure cases is embodied in the one hundred and fifty-fourth rule, and is based on the well-known circumstance that the only rights ordinarily adjudicated upon in foreclosure causes are those of the mortgagee or mortgagees. The rights of the defendants, other than mortgagees, as between themselves, are not usually involved in the pleadings, and are liable to be, and oftentimes in fact are, quite different from what they appear to be by the statements in the bill.

There may, indeed, be cases where the amount involved is small and the pleadings and papers in the cause, which should always be laid before the master, show that some decree has already been made settling the rights of the parties, where the considerable expense attending such summonses may be dispensed with, but this is not one of those cases, as an examination of the proceedings in the foreclosure cause will show.

Mrs. Throckmorton, for some reason, was made a party defendant and appeared thereto, and then the petitioner Reilly was not a party to the suit, but came in by petition and claimed the title to a large sum of money as the proceeds of the sale by a conveyance *pendente lite* from Van Note, who appeared by the bill, and also by his answer, to be the owner of the equity and entitled to the surplus money brought in question. Now, I conceive that, according to fundamental principles, this court had no power whatever to make a decree affecting Van Note's right to that surplus money without giving him "his day in court." For aught that appeared to the master, the deed presented to him might have been forged or procured, as in fact it was, by palpable fraud. .

The action taken by the master and by this court, based upon the master's report, was as thoroughly unwarranted as would be the entering up of a judgment in ejectment in an

action at law without the service of process upon the defendant or tenant in possession. But this part of the case does not stop here.

If the learned master had examined the files of the court, as he should have done, he would have found among them, filed on August 12th, formal objections presented by Mrs. Throckmorton to the confirming of the sheriff's sale. I have no doubt the master acted innocently, but he was persuaded into acting in disregard of the well-settled rules of the court by Mr. McKenna, who knew the situation perfectly and practiced a fraud on the court.

That gentleman appeared before the master on the 16th of August, his report is dated on that day and the order confirming that report and granting the relief prayed for was made on the 20th.

Now, it is difficult to believe that Mr. McKenna, when he procured that final order, had not become aware of the order advised by Vice-Chancellor Reed, on the 12th of August, in the suit just commenced by Mrs. Throckmorton, forbidding the sheriff from paying the surplus money to Van Note, or to any other person, and directing him to pay it into the court of chancery.

Besides, as we have seen, Mr. Fay swears positively, and is therein uncontradicted, that he informed McKenna, before the sale, that he was about to take proceedings to reinvest Mrs. Throckmorton with the title of the premises, or, to use his language, "to recover possession of the premises for Mrs. Throckmorton," referring, undoubtedly, to the nature of the contest which arose between Mrs. Throckmorton and Mr. Van Note shortly after he acquired title over the constructive possession of the premises, in which Mr. Fay appeared for Mrs. Throckmorton and was defeated.

It thus appears, as well by Mr. McKenna's conduct in calling on Mrs. Throckmorton to acquire her interest in the premises as by direct information received from Mr. Fay, and without relying on Mr. Van Note's evidence, already cited at length, that Mr. McKenna was all the while perfectly aware that Mrs. Throck-

morton claimed an interest by way of an equity of redemption in the mortgaged premises, and, if so, then it was clearly his duty to have caused her to be summoned by the master and his failure so to do amounted, in my judgment, under the circumstances, to a fraud on the practice of the court.

I cannot refrain from saying that this transaction presents a striking example of the great necessity for extreme caution on the part of each and every member of the court, from the chancellor down to the youngest master, in the matter of disposing of surplus money.

I shall stop here to give the farther history of the suit just mentioned commenced by Mr. Fay for Mrs. Throckmorton.

Demurrers were filed to the bill by Van Note, for himself, Mr. Frank P. McDermott acting as his solicitor and counsel, and by McKenna, O'Reilly and Duffy, Mr. Roe acting as their counsel.

They were brought on for argument at the February Term, 1902, before the chancellor, and were sustained on the ground of multifariousness, as I read the memoranda of the chancellor.

Mr. Fay took no measures to amend his bill or to proceed further with the affair. Hence the order sustaining the demurrers ended the suit.

In the meantime Mrs. Throckmorton became reduced to absolute want and an object of charity. A gentleman who was visiting her as such object learned from her, roughly, how she had been despoiled of her fortune and called on Mr. Johnston, of the Monmouth bar, the present complainant, and interested him in her case.

Mr. Johnston investigated the case as well as he could, and undertook to recover her fortune, protecting himself, however, for his necessary disbursements and labors against the contingencies to which he was naturally and necessarily subject in such a case by taking a written agreement with Mrs. Throckmorton that he should have compensation for his services, not exceeding twenty-five per cent. of the amount recovered.

This agreement he was called upon at the hearing to produce and did produce, and upon an examination of it I came to the

conclusion that it was, under the peculiar circumstances of this case, a proper agreement, and one which the court ought to uphold to the extent, at least, of not allowing its existence to influence its action.

I have no doubt about the power of the orphans court, in the present instance, to confine the amount which Mr. Johnston shall be allowed to retain out of any recovery he may obtain herein to reasonable compensation for his services.

Pending the proceedings Mrs. Throckmorton died, testate of a will, which was duly probated, under which Mr. Johnston was executor, and he has been duly substituted as complainant herein.

Turning, now, to the facts of the case as they affect the defendant Reilly, I am unable to perceive how he can, upon any theory, escape liability, however innocent he may be personally of any fraud. The general rule is well settled, as it seems to me, that a person who obtains the title or possession of another's property or money through the fraud of his agent cannot retain such possession by setting up that he was himself innocent of the fraud and did not authorize it. No authority is necessary for this position. *2 Pom. Eq. Jur.* § *909.*

In this case it is manifest that the most charitable view to be taken of Reilly's conduct is that he loaned himself and his name to young O'Reilly and McKenna. He authorized O'Reilly to bid for him at the sale; he appeared and was sworn as a witness before the master and thereby assisted to procure the order relieving himself from actually paying into court the large sum which his agent had bid for him. He thereby expressly ratified the bid. At the request of the same agent he executed a mortgage on the premises to raise the money to pay the amount decreed to be raised under the execution; and also, later on, he executed a deed for the premises to Vaugoin, subject to that mortgage; and, according to the evidence of Mr. Duffy, he authorized that gentleman to receive the purchase-money, $6,500 or more, and after paying himself liberally, to divide it with approximate equality between McKenna and O'Reilly.

I stop here to say that Mr. Fay, by the amendment which he

made to his bill, which I have already recited, seems to have ascertained the actual facts and to have anticipated the future conduct of the parties with more accuracy than Mr. Johnston was able to accomplish, for the latter, unfortunately, instead of making young O'Reilly and McKenna parties defendant, sought to charge as such the complainants in the original foreclosure suit.

Now, Mr. Fay could have ascertained the facts charging McKenna, Duffy and Reilly only from Van Note, and he must have obtained them and interpolated the names of those gentlemen in his bill before a subpoena was issued, which was on the 21st of August, so I think it is fairly inferable that Mr. Van Note's story testified to before me, if a pure invention, was invented very shortly after the foreclosure sale.

For these reasons I think there must be a recovery against Reilly, the only question being as to the amount. Shall it be gauged by the amount he bid at the sheriff's sale or by the amount which he actually realized on a resale? And shall he be credited with any allowances for services or counsel fees?

These questions have not been discussed by counsel and I am not ready, at this moment, to dispose of them.

Counsel may hand in written arguments promptly.

JANUARY 16th, 1905.

PITNEY, V. C.

I have now heard all that the counsel seem to desire to say to me on the question reserved and have given it careful consideration, and have come to the conclusion that the defendant must be held for the amount of his bid. Several considerations have led me to this result.

*First.* The bid was made fairly, deliberately and intelligently. Mr. Duffy, as well as McKenna and Hugh O'Reilly, were all well acquainted with the premises and their value. The evidence satisfies me that the property was reasonably worth the sum bid. The competitor in bidding, Mr. Nathanson, acted in good faith with a real desire to purchase the premises. Not being called as a witness by either party, it cannot be known why, immediately

after the sale, he declined, as Mr. Duffy swears he did, to take the property at his own bid.

Two respectable and apparently disinterested real estate men of Long Branch valued the property at about $16,000. As against this valuation was set that of Mr. McKenna. He was asked by counsel for the defendant as to the value of the premises in question, and swore that it was worth about $11,000 and no more, and he gave his reasons at length for setting that price.

Now, the amount due on the execution, without the sheriff's fees, &c., was about $8,300, and Mr. Reilly gave $1,250 for the equity of redemption, making the property cost him, as Mr. McKenna knew perfectly well, over $9,000, and leaving him a margin, at that basis, of less than $2,000. Now Mr. McKenna swears that Mr. Hugh E. O'Reilly paid him, on behalf of Patrick J. Reilly, the modest sum of $1,200 for his services in negotiating the purchase of Mr. Van Note's equity of redemption, worth, on his own statement, less than $2,000.

This circumstance does not tend to strengthen Mr. McKenna's valuation.

It is, however, sufficient to say that Mr. Duffy, who made the bid for defendant, procured a confirmation of the sale against the objection of the complainant.

Moreover, a circumstance, which I omitted to state in its proper order, is not without its significance in this connection. Mr. Duffy swears that as solicitor for complainant he waived the payment of the usual "down money" of ten per cent., or twenty per cent., or whatever it was, which was called for by the conditions of sale; the sheriff accepted his waiver and none was actually paid.

This waiver by the sheriff and Mr. Duffy was entirely unwarranted under the circumstances of this case, where there was a decree in favor of another party besides the complainant, who was not represented by Mr. Duffy, to say nothing of the large amount of surplusage involved, and their action in waiving the payment of the down money probably rendered both Mr. Duffy and the sheriff liable to make good the bid. Be that as it may, the defendant was undoubtedly liable for his bid, for he ratified

Mr. Duffy's action in making the bid; procured the order dispensing with paying the money into court, and also, as before stated, procured the confirmation of the sale against the written objection of Mrs. Throckmorton, duly filed.

The only thing which can be claimed to relieve him from liability is the order of August 20th, dispensing with the paying of the money into court. This order may relieve the sheriff because acted upon by him in good faith without notice to him of its infirmity, but I cannot accord to the defendant the same benefit from it for the reasons already stated, which lead me to the conclusion that it was procured by the fraud of the defendant's solicitor and that it was entirely unwarranted in law and equity as against Mr. Van Note and the complainant, and must be treated as absolutely void and of no effect as between her and the defendant.

The defendant therefore, in my judgment, is absolutely bound by that bid and the cause must be here determined upon the basis either of the money having been actually paid into court or of the complainant suing to compel defendant to fulfill his contract by paying the money into court. In fact, in equity, the bid made by the defendant was a promise to pay the complainant the sum of $16,300 for the premises, less the sum due upon the execution and the amount paid by him to Van Note.

If that be so, then Mrs. Throckmorton's right therein became vested and cannot be diminished by the subsequent conduct of the defendant and his agent based upon such void order.

But, in the next place, according to well-established rules of this court, the defendant is expressly chargeable with the larger sum. The case presented is one of positive, actual, deliberate fraud practiced by the trustee upon his *cestui que trust,* and is without a redeeming feature by which the defendant's liability can be ameliorated in the least degree. There is no element of good faith in it.

It is clearly distinguishable from that class of cases where the party charged, though finally determined to be in the wrong, still had some show of ground to suppose that he was in the right, and therefore can be said, in a sense, to have acted

in good faith.  Such a case was *Barnes* v. *Taylor, 27 N. J. Eq.*
*(12 C. E. Gr.) 266; 28 N. J. Eq. (1 Stew.) 625; 30 N. J. Eq.*
*(3 Stew.)* 7.

No authority was cited to me precisely in point with the
present case.  The remedy of the *cestui que trust* against the
trustee who has converted the trust property to his own use by
the machinery of a public sale has some signficance.  The rule
seems to be well settled that in such case the *cestui que trust* has
the right to have the property exposed for sale, and if it brings
a greater price than the trustee paid the trustee shall be liable
for such increased price, and if it does not bring more than or
as much as the trustee paid for it at the public sale he shall
be charged with the amount that he paid, so that the trustee is
bound, at all events, for the purchase-price fixed by the sale to
himself and to as much more as the property will bring at
further public sale.

And where, as here, the trustee has conveyed the property to
a *bona fide* purchaser, the rule is thus stated by Mr. Lewin:

"If, before the *cestui que trust* commences proceedings for relief, the
trustee has passed the estate into the hands of a purchaser without
notice, the *cestui que trust* may compel the trustee to account for the
difference [increase] in price, *or for the difference between the sum the
trustee paid and the real value of the estate at the time of the purchase,
with interest.*"  *Lew. Trusts (Flint's 8th Eng. ed.) \*494,* and cases cited.

It is obviously inequitable to permit a trustee who has ac-
quired title to the property of his *cestui que trust* at a certain
price to reconvey it to a *bona fide* purchaser, and thereby escape
any degree of liability or make any gain.  If he sells it at an
advance, the advance belongs to the *cestui que trust;* if he sells
it at a loss, he does so at his own risk and must account for at
least the sum he paid.  And to hold otherwise would be, in the
latter case, to assist the tortious trustee in disposing of the
property at the best price he could get, putting the money in his
pocket and embarrassing the *cestui que trust* in recovering even
the diminished price at which he sold it.

A case decided by Lord Langdale, master of rolls, in 1843
(*Sadler* v. *Lee, 6 Beav. 324*), has some significance.  The *cestui*

*que trust* in that case was the owner of nearly £12,000 of three and a half per cent. government annuities and lodged the certificate thereof with bankers, with a power of attorney, which enabled them not only to collect the dividend which was the object of the transaction, but also to transfer the stock. The bankers wrongfully sold and transferred the stock and converted the proceeds to their own use; the sale was concealed and the dividends were for some time accounted for, but finally, being discovered, suit was instituted, and the question was as to the amount of the recovery. The defendants claimed that the recovery should be confined to the amount actually received on the wrongful sale of the stock. The complainant's *cestuis que trustent* claimed the amount which it had cost them to replace the stock, which was a greater sum than they had produced when sold, and Lord Langdale held the latter to be the proper rule.

But, as before shown, the trustee is bound to account for the full value of the property, and he has never been permitted, in the absence of accident or mistake, to escape liability for the full amount which he himself promises to give for it at a public sale.

Much more in a case like this, where it clearly appears that the price so given was a fair one.

It may be said, in opposition to this view, that *non constat* that but for Mr. Duffy's bidding Mr. Nathanson would have bought the property at a much less sum. But the defendant has no right to set up that his bidding resulted in the complainant's benefit. The presumption is that he bid so much for the property because he thought it worth it. The only reason which I can imagine induced him to persist in outbidding Mr. Nathanson is one which, in my judgment, does not help him. It is this, that he did not intend and it was not consistent with his plan of operations that any money should be paid into court. If the money was once paid into court it would certainly lie there until the sale was confirmed and the deed delivered, and it would have been within the easy reach of Mrs. Throckmorton and her friends, if she had any left. But by bidding it in himself he became the master of the situation, so to speak, and might be

able, as he was, to procure the sheriff's deed by paying only the amounts due upon the execution.

There remains to consider the question whether any allowances shall be made to the defendant for his expenses or counsel fee.

If the defendant had proceeded to execute the trust as assumed by him through his agents, O'Reilly and McKenna, he would have been entitled to reasonable, and, I may add, under the circumstances, liberal, allowances for counsel fees and commissions, besides expenses; but, unfortunately, he did not do so, and it is quite apparent that he never intended to do so. On the contrary, he ignored and denied the trust and attempted to deal, and did deal, with the property and the proceeds of its sale in entire disregard of complainant's rights precisely as if the property was absolutely his own, and when called upon to account he persisted in his denial of the trust and contested it by all means known to the law. Under such circumstances no authority is necessary for the position that the trustee is entitled to no compensation for his own services. Nor can I find any ground upon which I can hold that he is entitled to any compensation for counsel fees or expenses.

No services were rendered by counsel of defendant for complainant or in her interest, and no expenses were incurred in her service or in her behalf. I am therefore unable to advise any allowance to the defendant.

I will advise a decree in favor of the complainant for an amount to be made up as follows:

Charge the defendant with the sum of $16,300 as of the date when the sheriff's deed was ready for delivery, which, I believe, was the 5th of September, 1901; credit him with the sum of $1,250 as of the 5th of August, 1901, with interest to the 5th of September, 1901; credit him with the amount due on the execution on that date, September 5th, 1901, with the sheriff's execution fees; the balance, with interest, to the date of the decree will be the amount to be inserted therein to be recovered by the complainant against the defendant, with costs.

The complainant will be entitled to a counsel fee, to be fixed on application.